**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>STEPHEN PATRICK CRAIG,<br>SSN: xxx-xx-8662,<br>LAURA STEPHANIE CRAIG,<br>SSN: xxx-xx-3458,<br><br>    Debtors. | Case No. 24-16381-JGR<br>Chapter 7 |
| ESTATE OF CHERYL M. SHEGA,<br><br>    Plaintiff,<br>v.<br><br>STEPHEN PATRICK CRAIG,<br>LAURA STEPHANIE CRAIG,<br><br>    Defendants. | Adv. Pro. No. 25-01012-JGR |

**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On January 22, 2025, the Estate of Cheryl M. Shega ("Plaintiff") filed a complaint for Determination of Dischargeability of Debt pursuant to 11 U.S.C. § 523(a) against Defendants Stephen Patrick Craig ("Stephen") and Laura Stephanie Craig ("Laura") (collectively, the "Craigs").

The complaint seeks to except from discharge a prepetition jury verdict entered in favor of the Plaintiff and against the Craigs in the total amount of $918,522.81 raising four claims for relief: (1) determination of nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A); (2) determination of nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(4); (3) determination of nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(6); and (4) civil theft pursuant to C.R.S. §§ 18-4-401 and 18-4-405.

On January 7, 2026, the Craigs filed a Motion for Summary Judgment ("Craigs' Motion") seeking dismissal of the First Claim for Relief under 11 U.S.C. § 523(a)(2)(A) (Doc. 15). Plaintiff filed a Response on January 28, 2026 (Doc. 20). The Craigs did not file a reply.

On January 15, 2026, Plaintiff filed a Motion for Summary Judgment ("Plaintiff's Motion") on the Second Claim for Relief under 11 U.S.C. § 523(a)(4) and on the Third Claim for Relief under 11 U.S.C. § 523(a)(6) (Doc. 17). The Craigs filed a Response on February 2, 2026 (Doc. 21) and the Plaintiff filed a Reply on February 16, 2026 (Doc. 23).

## BACKGROUND

In July 2020, Plaintiff filed a complaint against the Craigs, American Bank of the North, Gerri Chapman, and Becky Radika in the District Court, Civil Division, Sixth Judicial District, County of St. Louis, State of Minnesota, Court File No: 69DU-CV-20-1245 ("State Court Case").  The focus of the State Court Case concerned the designation of Laura as the payable upon death beneficiary on four certificates of deposit inherited be Cheryl from her parents totaling approximately $250,000.  The complaint brought eight counts for relief.

(1) Against the Craigs for undue influence.

(2) Against the Craigs, American Bank of the North, Gerri Chapman, and Becky Radika for exploitation of a vulnerable adult (MINN. STAT. § 626.577. Subd. 20).

(3) Against the Craigs for unjust enrichment.

(4) Against the Craigs for tortious interference.

(5) Against the Craigs for deception/fraud.

(6) Against the Craigs for intentional misrepresentation.

(7) Against American Bank of the North for negligence.

(8) Against American Bank of the North and Gerri Chapman for aiding and abetting the exploitation of a vulnerable adult.

As the State Court Case proceeded, various motions for summary judgment were filed by the defendants on the eight counts for relief.  An order resolving the summary judgment motion was entered on December 23, 2022, in the State Court Case.

Summary judgment was GRANTED in favor of Stephen on Count One - Undue Influence; in favor of American Bank of the North, Gerri Chapman, and Becky Radika on Count Two - Exploitation of Vulnerable Adult; in favor of American Bank of the North, Gerri Chapman, and Becky Radika on Count Four - Tortious Interference; in favor of the Craigs on Count Five - Deception/Fraud; in favor of the Craigs on Count Six - Intentional Misrepresentation; and in favor of American Bank of the North, Gerri Chapman, and Becky Radika on Count Eight-Aiding and Abetting Exploitation of a Vulnerable Adult.

Summary judgment was DENIED against the Craigs on Count Two - Exploitation of Vulnerable Adult; against the Craigs on Count Three - Unjust Enrichment; against the Craigs on Count Four - Tortious Interference; and against American Bank of the North, Gerri Chapman, and Becky Radika on Count Seven - Negligence.

A two-week jury trial was held on the claims that survived summary disposition in September 2024.   A special jury verdict awarded compensatory damages to the Plaintiff:

1. $247,424.97 against Laura for Undue Influence;

2. $250,000.00 against Laura and Stephen for Tortious Interference with Perspective Economic Advantage;

2

3. $247,424.97 against Laura and Stephen for Unjust Enrichment; and

4. $250,000.00 as Compensatory Damages against Laura and Stephen for Financial Exploitation of a Vulnerable Adult.

After obtaining relief from stay, on December 24, 2025, a final judgment was entered in favor of the Plaintiff and against the Craigs in the total amount of $918,522.81.   The compensatory damages were reduced to a single recovery in the amount of $250,000 which were trebled to $750,000.   The balance of the judgment consisted of attorney fees in the amount of $151,454.06 and costs in the amount of $17,068.75.

Earlier, in the State Court Case, Plaintiff appealed the dismissal of the claims against American Bank of the North, Gerri Chapman, and Becky Radika to the Court of Appeals of Minnesota, which affirmed the dismissal.   The Minnesota Court of Appeals summarized the background of the case as follows:

### FACTS

This case involves an appeal from an order granting summary judgment to respondent American Bank of the North (the bank) for disbursing appellant Cheryl M. Shega's certificate of deposit (CD) funds to the named payee-on-death (POD), Laura Craig. The following facts are based on the record at summary judgment and presented in the light most favorable to the estate of Cheryl Shega.

### Background Information

Cheryl Shega was the oldest of three children and lived with her parents, Edward and Charlene Shega (the Shegas), throughout most of her life. Cheryl's siblings are Nancy Weiser and Gregory Shega. Although Cheryl was not formally diagnosed with a disability until later in life, most people in her life were aware that she suffered from a mental illness. Cheryl maintained a "childlike approach to life," adopting a daily routine of sleeping in, watching TV, and spending time on the internet. Cheryl did not work outside of the home, other than a few jobs in her late twenties. The Shegas financially supported her most of her life, even claiming her as a dependent on their taxes until 2016.

One of Cheryl's hobbies was searching for long lost relatives. In 2012, she reached out to defendant Laura Craig, a woman she believed was her cousin. Laura responded, and the two began communicating primarily via email. In a February 2012 email, Cheryl promised Laura that she would "never tell anyone where you are or that I am in contact with you."

When Cheryl's mother, Charlene, died in March 2015, Cheryl began taking care of her father, Edward, and the household

3

chores. During this time, siblings Nancy and Gregory did not live with or near Cheryl. Also during this time, Edward had a "significant number of ambulance runs to the ER" and hospitalizations. Nancy and Gregory grew concerned about their father's health and flew back to speak with Cheryl in November 2016. There, Gregory asked Cheryl to see Edward's trust, and Cheryl "became completely out of control, in a way that [Gregory] had rarely witnessed." Edward passed away in May 2017, and Cheryl remained living in his home.

In May 2019, law enforcement responded to a welfare check at the Shega's home. Law enforcement found the house was a mess and discovered Cheryl "on the ground, unable to sit up . . . somewhat paranoid . . . [and] confused in appearance." A neighbor told police that Cheryl had not left the home in five months and crashed her car in a ditch because she was "nearly blind." And according to Gregory, the home was in complete disarray, with piles of newspapers, waste, dozens of mice and rats, soiled clothing, and hair and cat feces everywhere. Cheryl passed away on May 27, 2019.

**The Shegas' Revocable Living Trust**

In November 2009, the Shegas executed The Shega Family Revocable Living Trust (the trust). The Shegas named Cheryl as the sole beneficiary of the trust, identified her as the personal representative of their wills, and named her as the financial power of attorney. And if Cheryl predeceased the Shegas, then Gregory and Nancy would be the recipients of the trust's assets. The Shegas also signed a joint request for retitlement, which was addressed to the bank and referenced three, unnumbered CDs.

After Cheryl's death in May 2019, Nancy and Gregory found records of Cheryl's CDs that she inherited while going through paperwork in the home. There were four CDs in particular. Between 2016 and 2017, Cheryl redeemed the CDs she inherited, had new CDs issued in her name, and named Laura as the POD on the new CDs. The value of the four CDs was approximately $250,000.

*Shega v. Am. Bank of the N.*, No. A25-0168, 2025 Minn. App. Unpub. LEXIS 590, at *1-4 (Aug. 4, 2025)[1].

## STANDARDS FOR SUMMARY JUDGMENT

---

[1] The opinion was attached to the Plaintiff's Motion as Exhibit 4.

4

The Court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Bankr.P 7056, incorporating Fed.R.Civ.P. 56. The burden is on the moving party to make a prima facie case showing an absence of material fact and entitlement to judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1291 (10th Cir. 1991). In applying the summary judgment standard, the Court must examine the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000).

### THE PRECLUSIVE EFFECT OF THE STATE COURT CASE

This Court has subject matter jurisdiction over this core matter to determine the dischargeability of a particular debt pursuant to 28 U.S.C. § 157(a) and (b)(2)(I).

The dischargeability of claims under 11 U.S.C. § 523(a) involves a two-part analysis. The first step requires "the bankruptcy court [to] determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016). The second step is a determination of whether the debt is excepted from discharge under the applicable section of 11 U.S.C. § 523(a). *Id.*

The judgment entered in the State Court Case in favor of the Plaintiff and against the Craigs in the amount of $918,522.81 establishes the validity of the debt under applicable law.

The cross-motions for summary judgment seek to use the prior rulings issued in the State Court Case to prevent re-litigation of the elements required to determine dischargeability of the Plaintiff's debt. The parties have raised the doctrines of res judicata or "claim preclusion" and collateral estoppel or "issue preclusion."

"Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not re-litigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S. Ct. 1808, 1814 (2001); *Brown v. Felsen*, 442 U.S. 127, 131, 99 S. Ct. 2205, 2209 (1979) ("Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.").

Collateral estoppel, or, in modern usage, issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (citation omitted). Collateral estoppel applies in dischargeability

cases, and the burden of proof is on the creditor to establish a non-dischargeable debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The bankruptcy court must give collateral estoppel effect to all issues that were "actually litigated" and necessary to the resulting final judgment, and for which the defendant had a "full and fair opportunity" to present the case.  If collateral estoppel is a basis for a judgment in a dischargeability action, the debtor is precluded from re-litigating the factual elements of the dischargeability claim because of the determinations made in the prior case.

The State Court Case was pending in Minnesota. "The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings 'shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.'" *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332 (1985) (citing 28 U.S.C. §1738).

Under Minnesota law:

> The legal concept of res judicata is intended to prevent repetitious litigation. Res judicata contains two related concepts: claim preclusion (or res judicata) or issue preclusion (collateral estoppel). Claim preclusion, also known as merger or bar, operate[s] where a subsequent action or suit is predicated on the same cause of action which has been determined by a judgment, no matter what issues were raised or litigated in the original cause of action.

*Walden Bros. Lumber, Inc. v. Wiggin*, 408 N.W.2d 675, 677 (Minn. Ct. App. 1987).

Collateral estoppel applies when: (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.  *Ellis v. Minneapolis Com. On Civil Rights*, 319 N.W.2d 702, 703-04 (Minn. 1982).

Collateral estoppel applies in dischargeability cases, however, exceptions to discharge are narrowly construed in furtherance of the fresh start objective of bankruptcy and doubts are resolved in favor of debtors. *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

The Bankruptcy Code must be construed liberally in favor of debtors and against creditors. *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292-93 (10th Cir. 1997).

Nevertheless, the fresh start in bankruptcy is limited to unfortunate debtors who are nonetheless honest. *Grogan*, 498 U.S. at 287.

## CRAIGS' MOTION FOR SUMMARY JUDGMENT

The Craigs seek summary judgment denying the Plaintiff's First Claim for Relief under 11 U.S.C. section 523(a)(2)(A) based on the prior dismissal of the counts for misrepresentation and fraud in the State Court Case.

### Exhibits and Statements of Material Facts

The Craigs' Motion attached as Craigs' Exhibit 1 the Order and Memorandum regarding all Defendants' Motions for Summary Judgment entered in the State Court Case on December 23, 2022.  An Order for Judgment dated September 23, 2024 entered in the State Court Case was attached as Craigs' Exhibit 2.  An affidavit executed by Stephen and Laura verifying the factual allegations in the Craigs' Motion was filed separately on January 15, 2026 (Doc. 16).

The Plaintiff's Response attached the Order for Judgment dated September 23, 2024, entered in the State Court Case was attached as Exhibit 5[2].  The Order for Judgment signed by the administrator of the judgment role entered on December 3, 2024, was attached as Exhibit 6.  The Complaint filed in the State Court Case was attached as Exhibit 7.

In the Craigs' Motion and the Plaintiff's Response, the parties stipulated to the following facts:

On or about July 14, 2020, Plaintiff filed the State Court Case against the Craigs and others in the State of Minnesota, County of St. Louis.

In the State Court Case, Plaintiff asserted claims arising out of the same nucleus of operative facts as the claims asserted in the adversary proceeding, namely Undue Influence, Exploitation of a Vulnerable Adult under Minn. Stat. § 626.557.Subd.20, Unjust Enrichment, Tortious Interference, Deception/Fraud, Intentional Misrepresentation, Negligence, and Aiding and Abetting the Exploitation of a Vulnerable Adult.

In the State Court Case, the Craigs filed a Motion for Summary Judgment.  The parties fully briefed the matters as to the counts of misrepresentation and fraud.  On December 23, 2022, the court in the State Court Case entered an order for judgment on the merits in favor of Stephen and Laura.

The judgment in the State Court Case has not been vacated, set aside, or reversed and remains a valid, final judgment of a court of competent jurisdiction.

The parties agree that a judgment was entered in the State Court Case on the remaining claims after a jury trial.  A judgment was entered on September 23, 2024, by the court in the State Court Case upon the conclusion of the jury trial, but as a result of procedural technicalities, the judgment did not become final until December 24, 2024.

---

[2] Plaintiff's exhibits 1, 2, 3, and 4 were attached to the cross-motion for summary judgment.

**Analysis**

The Craigs argue a summary disposition of the claims for Deception/Fraud and Intentional Misrepresentation is entitled to preclusive effect barring Plaintiff's claim under 11 U.S.C. § 523(a)(2)(A).  Moreover, the Defendants argue res judicata, or claim preclusion, applies.

The specific operative facts in the State Court Case pleaded in support of the count for Deception/Fraud and for Intentional Misrepresentation were: (1) Laura and Stephen took advantage of Cheryl and misled her into believing she was isolated with only them in her life and (2) Laura may also have misled Cheryl into believing that Laura was her long lost cousin. (Exhibit 7, ¶¶ 199, 200, 206, and 207).

The detailed Memorandum issued with the Order Granting Summary Judgment in the State Court Case (Craigs' Exhibit 1) sets forth the elements of a fraud claim under Minnesota law.  The Plaintiff must prove five elements: "(1) the false representation by the [Defendant] of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [the other party] to act in reliance thereon; (4) that the representation caused [the other party] to act in reliance thereon; and (5) that [the other party] suffered pecuniary damages as a result of the reliance."  *Sorchaga v. Ride Auto, LLC*, 893 N.W.2d 360, 369 (Minn. App. 2017), *aff'd* 909 N.W.2d 550 (Minn. 2018).

Intentional Misrepresentation under Minnesota law requires a showing that the defendants: "(1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance of the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation."  *Jane Doe 43 C v. Diocese of New Ulm*, 787 N.W.2d 680, 686 (Minn. App. 2010).  "A misrepresentation may be made by an affirmative statement that is itself false or by concealing or not disclosing certain facts that render facts disclosed misleading." *Heidbreder v. Carton*, 645 N.W.2d 355, 367 (Minn. 2002).

The court considered Plaintiff's argument that the communications between Laura and Cheryl, set forth in the general allegations of the complaint, evidenced a pattern of false statements and misrepresentations made to induce Cheryl to name Laura as the payable upon death beneficiary of the CDs.  The court found none of the communications include a mention of the CDs, Cheryl's assets, or financial matters.  The court held:

> To succeed on a claim of fraud, deception, or intentional misrepresentation, there must be a link between the false statement and the action the other party takes.  If the representation does not induce action, it is not material.  *See Gaertner v. Rees*, 259 Minn. 299, 303, 107 N.W.2d 365, 368 (1961).  Plaintiff has not provided sufficient evidence to show a link between Laura and Cheryl's communications and the beneficiary designations of the CDs.  There is not enough sufficient evidence to show the communications between Laura and Cheryl induced Cheryl to make Laura the beneficiary on the CDs.  There is no genuine issue of material fact to survive the

8

> motion for summary judgments on the counts of Deception/Fraud and Intentional Misrepresentation. Therefore, the Craigs' motion for summary judgment on those counts is granted.

Craigs' Exhibit 1, p. 16.

The Craigs' Motion argues the doctrine of res judicata or "claim preclusion" applies to the ruling in the State Court Case to prevent relitigating the factual basis to establish an exception to discharge under 11 U.S.C. § 523(a)(2)(A).

Under 11 U.S.C. § 523(a)(2)(A), a debt obtained by false pretenses or a false representation is not dischargeable when a creditor proves:

> (1) the debtor made a false representation; (2) with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor.

*In re Denbleyker*, 251 B.R. 891, 895 (Bankr. D. Colo. 2000) (citing *Field v. Mans*, 516 U.S. 59, 71 (1995)); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

Plaintiff's First Claim for Relief under 11 U.S.C. § 523(a)(2)(A) alleges the Craigs made false representations relied on by Cheryl to tender the CDs based on such reliance. The alleged false representation or omissions included:

a. The jury in the MN Civil Case made numerous findings of fact;

b. Misleading her into believing that she was isolated with only the Debtors in her life;

c. They worked to convince Cheryl that she needed to fear her siblings by telling her to change the locks, get a restraining order, and get a barker dog;

d. Telling Cheryl she was a gift from god because god knew how much the Craigs needed Cheryl, and how the holy spirit was directing the relationship between them

e. Not disclosing the true nature of the relationship between Stephen Craig and Gerri Chapman.

f. They controlled Cheryl's behavior by exerting a "higher power, fear, and love bombing". They convinced Cheryl that she could trust them because Stephen was always on the lookout for deception or falsehood.

9

g.  Laura Craig concealed relevant facts by deliberately interfering with Cheryl's care while Cheryl was in the hospital by trying to convince staff that Cheryl was well enough to go home.

h.  Laura Craig further concealed relevant facts by deliberately interfering with Cheryl's care while Cheryl was in the hospital by trying to convince staff that Nancy did not have Cheryl's best interests in mind.

i.  Laura Craig misrepresented herself to the Hospital staff by telling them that Cheryl lived in fear of Nancy sticking her in a nursing home and cashing out the house and the trust to received the financial benefits, when in fact, Laura Craig was the only one who was aware of any financial assets besides the house.

j.  Laura Craig maliciously and continuously lied to Cheryl Shega telling her that the Craig family loved Cheryl so much. Yet, both Stephen and Laura stated that Stephen and their daughter's relationship with Cheryl was "most minimal' and did not have any feelings for Cheryl at all;

k.  Laura Craig misled Cheryl Shega into believing that she cared about her feelings, when in fact Laura was mocking and belittling Cheryl's lack of knowledge that she was being scammed by the Craigs. Cheryl told Laura Craig that Edward thought of Laura as his daughter. When asked in her deposition what she thought when Cheryl told her that, Laura replied in a mocking tone "oh, that's nice," then went on to say she really did not believe it. Laura just played along with Cheryl's belief that her dad was part of their happy family;

l.  Then, when Cheryl told Laura that Edward was happy that Cheryl made Laura the beneficiary of the assets, Laura stated in her deposition that she was merely humoring Cheryl with "this little bit of money she wanted to give to me."

The debt sought to be excepted from discharge arose from the allegedly improper designation of Laura as the beneficiary of the four CDs.  The facts pleaded in support of the 11 U.S.C. § 523(a)(2)(A) claim arise out of the same pattern of facts previously alleged in the State Court Case with respect to the counts of Fraud/Deception or Intentional Misrepresentation.  The conduct complained of occurred prior to the filing of the State Court Case and was duly considered in the Order granting summary judgment.

The elements necessary to establish a claim under 11 U.S.C. § 523(a)(2)(A) are, if not identical, substantially similar (with no meaningful legal distinction) to the elements required to prove Fraud/Deception or Intentional Misrepresentation under applicable Minnesota law.

10

The claim that the Craigs made false representations or omissions with the intent to deceive Cheryl, inducing her to change the beneficiary designation was rejected in the State Court Case.  Because there was no connection between the alleged false representations and the beneficiary change, no damages occurred.

The Craigs argue the doctrine of res judicata prevents the Plaintiff from pursuing the 11 U.S.C. § 523(a)(2)(A) claim.  The ruling in the State Court Case resulted in a final judgment on the merits in favor of the Craigs on the Fraud/Deception and Intentional Misrepresentation counts by a court of competent jurisdiction.  The parties to this action, the Plaintiff and the Craigs, are identical to those in the State Court Case.  Plaintiff's claim under 11 U.S.C. § 523(a)(2)(A) arises from the same transaction or occurrence, or the same nucleus of operative facts, as the claims asserted or that could have been asserted in the State Court Case.

The difficulty in applying res judicata is that the claims arising under 11 U.S.C. § 523(a)(2)(A) do not exist unless and until a bankruptcy case is filed.  Under Minnesota law, res judicata does not apply if "the right to assert the second claim did not arise at the same time as the right to assert the first claim."  *Mach v. Wells Concrete Prods. Co.*, 866 N.W.2d 921, 925 (Minn. 2015) (citing *Care Inst., Inc. v. Cty. of Ramsey*, 612 N.W.2d 443, 447 (Minn. 2000)).

However, "[c]ollateral estoppel applies when *separate actions* involve different claims, but identical parties and issues. When issues essential to the decision in the initial action arise in a later action, they are deemed to have been concluded in the earlier action." *Walden Bros. Lumber* 408 N.W.2d at 677.

The doctrine of collateral estoppel prevents the re-litigation of the 11 U.S.C. § 523(a)(2)(A) claim.  (1) The elements necessary to establish the claim are the same elements considered in the prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

Applying the doctrine of collateral estoppel, the Craigs are entitled to judgment as a matter of law on the First Claim for Relief under 11 U.S.C. § 523(a)(2)(A).

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In direct opposition to the Craigs' Motion, Plaintiff seeks summary judgment granting the Second Claim for Relief under 11 U.S.C. § 523(a)(4) and the Third Claim for Relief under 11 U.S.C. § 523(a)(6) based on the jury verdict entered in the State Court Case.

11

**Exhibits and Statements of Material Facts**

The Plaintiff's Motion attached Exhibit 1, the Closing Jury Instructions. Attached as Exhibit 2 was the Special Jury Verdict. The Judgment entered in the State Court Case on December 24, 2025, was attached as Exhibit 3. Attached as Exhibit 4 was a copy of *Shega v. Am. Bank of the N.*, No. A25-0168, 2025 Minn. App. Unpub. LEXIS 590 (Aug. 4, 2025).

In Plaintiff's Motion, the following material facts were alleged to be undisputed, were not controverted by the Craigs, and are therefore admitted for purposes of the Plaintiff's Motion pursuant to L.B.R. 7056-1(d):

1. This Court has core jurisdiction over this action pursuant to 28 U.S.C. § 157(b)(2)(I). This Court further has jurisdiction over matters arising in or related to a case under Title 11 pursuant to 28 U.S.C. § 1334.

2. Venue is proper pursuant to 28 U.S.C. § 1409(a) as the above-captioned Debtor filed for relief in Colorado.

3. Plaintiff *In re Estate of Cheryl M. Shega A/K/A Cheryl Shega* is open in St. Louis county district court, state of Minnesota, court file no. 69 HI-PR-19-49.

4. Gregory Shega is the personal representative for the estate.

5. Stephen Patrick Craig is the debtor in the underlying bankruptcy case. The Debtor resides at 2008 Killdeer Court, Colorado Springs, Colorado, 80951.

6. Laura Stephen Craig is married to Stephen Patrick Craig and is the debtor in the underlying case. The Debtor resides at 2008 Killdeer Court, Colorado Springs, Colorado, 80951.

7. The Debtors filed for relief under Chapter 7 of Title 11 of the United States Code on October 28, 2024, in this Court.

8. The deadline for filing a complaint for non-dischargeability of debt is January 24, 2025.

9. Decedent, Cheryl Shega, was the oldest of the three children of Edward and Charlene Shega.

10. She [Cheryl Shega] lived with her parents almost her entire life at their home located at 12775 Highway 16, Hibbing, MN 55746.

11. Laura (Johnson) Craig is the daughter of Norman Johnson, the brother of Charlene Shega, Cheryl's mother. They are first cousins.

Paragraph 12 incorporated the Closing Jury Instructions (Ex. 1) reciting Minnesota law on the Financial Exploitation of a Vulnerable Adult; Undue Influence, Tortious Interference with Prospective Economic Advantage; and Unjust Enrichment.

The Craigs' Response agreed the State Court Case involved the claims referenced in the Closing Jury Instructions.

12

Paragraph 13 incorporated the Special Jury Verdict (Ex. 2).

The Craigs' Response admits the jury found in favor of Plaintiff on all four claims and awarded compensatory damages totaling $247,424.97 (undue influence) and $250,000.00 (financial exploitation, tortious interference, and unjust enrichment).

Paragraph 14 incorporated the Judgment (Ex. 3).

The Craigs' Response admits the trial court trebled the $250,000.00 award for financial exploitation to $750,000.00 pursuant to Minn. Stat. § 626.557, subd. 20, and awarded $151,154.06 in attorney's fees and $17,068.75 in costs, for a total judgment of $918,522.81.

The Craigs' Response argues the jury was not asked to determine whether the Craigs committed embezzlement or larceny as the terms are defined under federal bankruptcy law; was not asked to determine whether the Craigs intended to injure the Plaintiff or acted with substantial certainty of causing injury; and that the Minnesota Supreme Court has not recognized undue influence as a freestanding tort.

Specifically, the Craigs' Response claims the following material facts are in dispute:

1. Whether the Minnesota jury findings satisfy the elements of embezzlement or larceny under 11 U.S.C. § 523(a)(4).

2. Whether the Minnesota jury findings satisfy the elements of willful and malicious injury under 11 U.S.C. § 523(a)(6).

3. Whether the Craigs acted with fraudulent intent or *animus furandi* (intent to permanently deprive).

4. Whether the Craigs intended to injure Plaintiff or acted with substantial certainty of causing injury.

5. Whether Cheryl Shega's consent was vitiated such that the Craigs' receipt of the CD funds constituted larceny (unlawful taking) rather than a gift or request.

A declaration executed by the Craigs in support of the Response was filed separately on February 5, 2026 (Doc. 22).

**Analysis**

A two-week jury trial was conducted in the State Court Case in September 2024.  At the close of evidence, the jury was provided with Closing Jury Instructions.  The instructions explained the duties of the jury and the judge; deciding the facts; impartiality, fairness, and bias; the roles and statements of the attorneys and the judge; evidentiary considerations; and other legal concepts.  The Closing Jury Instructions included specific instructions explaining the legal definitions and required elements of the various counts at issue in the adversary proceeding (Ex. 1).

Financial Exploitation of a Vulnerable Adult.

Financial exploitation of a vulnerable adult under Minnesota law is defined as a person who, in the absence of legal authority, acquires possession or control of an interest in real or personal property or other financial resources of a vulnerable adult, whether held in the name of the vulnerable adult or a third party, through the use of undue influence.

To prove financial exploitation of a vulnerable adult, the greater weight of the evidence must prove each of the following:

First, the evidence must show that Cheryl Shega was a vulnerable adult. A vulnerable adult is a person who is 18 years of age or older, and who possesses a physical or mental infirmity or other physical, mental or emotional dysfunction that impairs the person's ability to provide adequately for her own care without assistance, including the provision of food, shelter, clothing, health care, or supervision, and, because of the dysfunction or infirmity and the need for care or assistance, has an impaired ability to protect self from maltreatment.

Second, the evidence must show that Laura Craig, Stephen Craig, or both acquired possession or control of, or an interest in, funds or property of Cheryl Shega.

Third, the evidence must show that Laura Craig, Stephen Craig, or both acquired such possession, control of, or interest in funds or property of Cheryl Shega through the use of undue influence.

Fourth, the evidence must show that Laura Craig, Stephen Craig, or both acted without legal authority.

Undue Influence.

Undue influence is defined as influence of such a degree exerted upon a person by another that it destroys or overcomes the person's free agency and substitutes the will of the person exercising the influence for that of the other person.

To prove undue influence, clear and convincing evidence must prove not only that influence was exerted, but also that the influence was so dominant and controlling of the influenced party's mind that, in making the contract, the influenced party ceased to act of his or her own free will.

To determine whether Laura Craig unduly influenced Cheryl Shega, you may consider the following factors:

1. Whether Laura Craig had an opportunity to exercise undue influence over Cheryl Shega;

14

2. Whether there was a confidential relationship between Laura Craig and Cheryl Shega;

3. Whether Laura Craig actively participated in the changing of the beneficiary designations of the Certificates of Deposit;

4. Whether the change in the beneficiary was an unexpected disinheritance or an unreasonable disposition of the funds in the Certificates of Deposit;

5. Whether there was the exercise of influence or persuasion to make the beneficiary designations in question.

Tortious Interference with Prospective Economic Advantage.

Tortious interference with prospective economic advantage is defined as one who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry), whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (b) preventing the other from acquiring or continuing the prospective relation.

To prove tortious interference with prospective economic advantage, the greater weight of the evidence must prove each of the following:

First, that Plaintiff reasonably expected to be the recipient of some economic advantage from a third party.

Second, that Laura Craig, Stephen Craig, or both were aware of this expectation of economic advantage.

Third, that Laura Craig, Stephen Craig, or both intentionally interfered with plaintiff's reasonable expectation of economic advantage, and that this intentional interference was independently tortious. Independently tortious means that any act of interference must be a tort or unlawful. A tort is an act or omission that gives rise to an injury or harm to another.

Fourth, that in the absence of the wrongful act of Laura Craig, Stephen Craig, or both, it is reasonably probable that Plaintiff would have realized the economic advantage or benefit.

Fifth, that Plaintiff suffered damages as a result of this act.

15

Unjust Enrichment.

> A person is unjustly enriched if they have knowingly accepted a benefit such as money, and under the circumstances, it would be unjust for that person to keep the benefit without paying for it.
>
> To prove unjust enrichment, the greater weight of the evidence must prove the following:
>
> First, that Laura Craig, Stephen Craig, or both received something of value to which she, he or they were not entitled.
>
> Second, that Laura Craig, Stephen Craig, or both knowingly accepted the thing of value.
>
> Third, that Laura Craig, Stephen Craig, or both retained the thing of value under such circumstances that it would be inequitable for she, he, or they to retain that without paying for it. "Inequitable" means illegally or unlawfully, or that their conduct was unconscionable by reason of a bad motive, or that it would be morally wrong to retain the benefit.

After deliberation, the jury returned a Special Jury Verdict (Ex. 2) which included the following findings:

1. Did Plaintiff prove by clear and convincing evidence that Cheryl Shega's designation of Laura Craig as the beneficiary of the Certificates of Deposit ("CDs") was the product of undue influence by Laura Craig?

   CD #1:YES (October 11, 2017; redeemed amount $80,513.53)

   CD #2:YES (September 6, 2018; redeemed amount $38,286.63)

   CD #3:YES (October 4, 2018; redeemed amount $68,052.89)

   CD #4:YES (November 1, 2018; redeemed amount $60,577.92)

2. What amount of money will fairly and adequately compensate the Estate of Cheryl Shega for the damage due to the Undue Influence?

   $247,424.97

3. Did Plaintiff prove by the greater weight of the evidence that Cheryl Shega was a vulnerable adult?

   YES

16

4. Did Plaintiff prove by the greater weight of the evidence that Laura Craig and/or Stephen Craig acquired possession or control of an interest in the personal property or other financial resources of Cheryl Shega through the use of undue influence?

   YES

5. Did Plaintiff prove by the greater weight of the evidence that Laura Craig and/or Stephen Craig acted in the absence of legal authority?

   YES

6. What amount of money will fairly and adequately compensate the Estate of Cheryl Shega for the damage due to Financial Exploitation of a Vulnerable Adult?

   $250,000

7. Did Plaintiff prove by the greater weight of the evidence that Plaintiff reasonably expected to be the recipient of some economic advantage from a third party?

   YES

8. Did Plaintiff prove by the greater weight of the evidence that Laura Craig, Stephen Craig, or both were aware of this prospective economic advantage?

   YES

9. Did Plaintiff prove by the greater weight of the evidence that Laura Craig, Stephen Craig, or both intentionally and tortiously interfered with the Estate's prospective economic advantage?

   YES

10. Did Plaintiff prove by the greater weight of the evidence that in the absence of the wrongful conduct, it is reasonably probable that Plaintiff would have realized the economic advantage or benefit?

    YES

11. What amount of money will fairly and adequately compensate Plaintiff for the damage due to Tortious Interference with Prospective Economic Advantage?

    $250,000

12. Did Plaintiff prove by the greater weight of the evidence that Laura Craig, Stephen Craig, or both received something of value from Cheryl Shega?

    YES

17

13. Did Plaintiff prove by the greater weight of the evidence that Laura Craig, Stephen Craig, or both knowingly accepted something of value from Cheryl Shega?

YES

14. Did Plaintiff prove by the greater weight of the evidence that it would be unjust for Laura Craig, Stephen Craig, or both to retain something of value?

YES

15. By what amount of value was Laura Craig, Stephen Craig, or both unjustly enriched?

$247,424.97

As previously referenced, the Special Jury Verdict was reduced to Judgment on September 23, 2024, but did not become final until December 24, 2025, when the court entered Findings of Fact, Conclusions of Fact, and Order in the State Court Case. In addition to the compensatory damages in the amount of $250,000 awarded by the jury, the court awarded treble damages, attorney's fees, and costs for a total judgment amount of $918,522.81 jointly and severally against the Craigs (Ex. 3).

The Plaintiff's Motion argues the State Court Judgment is excepted from discharge under the provisions of 11 U.S.C. § 523(a)(4) and (a)(6). Applying collateral estoppel, the issues considered in the State Court Case are the same issues necessary to find the debt is excepted from discharge. Plaintiff argues there was a final judgment entered in the State Court Case. Plaintiff and the Craigs were parties in the State Court Case. The Craigs were represented by counsel and had a full and fair opportunity to be heard.

In response, the Craigs argue the jury findings are insufficient for purposes of collateral estoppel. Specifically, they argue: 1. The jury was not asked to determine whether the Craigs committed embezzlement or larceny as those terms are defined under Federal Bankruptcy Law; 2. The jury was not asked to determine whether the Craigs intended to injure Plaintiff or acted with substantial certainty of causing injury.

The application of collateral estoppel to state law judgments finding fraud to nondischargeability actions under 11 U.S.C. § 523(a)(2)(A) lends itself to an apples-to-apples comparison. The elements of a state law fraud claim and a bankruptcy nondischargeability claim are often similar, if not identical.

## 11 U.S.C. § 523 (a)(4) STANDARDS

The application of collateral estoppel to non-dischargeability claims under 11 U.S.C. § 523(a)(4) and (a)(6) tends to be more nuanced.

11 U.S.C. § 523(a)(4) provides that a Chapter 7 debtor is not discharged for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The parties have not argued that the Craigs engaged in fraud/defalcation while acting in a fiduciary capacity, so the analysis turns to embezzlement or larceny.

18

The elements of larceny and embezzlement are similar, distinguished by how the property was obtained, lawfully or unlawfully. "The difference between these two types of misconduct is that, with embezzlement, the debtor initially acquires the property lawfully whereas, with larceny, the property is unlawfully obtained." *Kim v. Sun (In re Sun)*, 535 B.R. 358, 367 (B.A.P. 10th Cir. 2015).

"Embezzlement is 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' Larceny is 'the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner.'" *Id.* (internal citations omitted).

The elements of embezzlement are: "1. Entrustment (property lawfully obtained originally); 2. Of property; 3. Of another; 4. That is misappropriated (used or consumed for a purpose other than that for which it was entrusted); 5. With fraudulent intent." *In re Tinkler*, 311 B.R. 869, 876 (Bankr. D. Colo. 2004).

Larceny involves the taking of property without the owner's consent.  It is the felonious stealing, taking and carrying, leading, riding, or driving away another's personal property, with intent to convert it or to deprive the owner thereof.  *United States v. Smith*, 156 F.3d 1046, 1056 (10th Cir. 1998).

Embezzlement and larceny both require a showing of animus furandi (intent to permanently deprive).  In the absence of direct evidence, intent can be inferred from the surrounding circumstances.  *Chenaille v. Palilla (In re Palilla)*, 493 B.R. 248, 252 (Bankr.D.Colo. 2013).

## 11 U.S.C. § 523(a)(6) STANDARDS

11 U.S.C. § 523(a)(6) provides that a Chapter 7 debtor is not discharged for willful and malicious injury by the debtor to another entity or the property of another entity. The creditor must establish that the conduct of the debtor was "willful and malicious" and caused an injury to an entity or the property of an entity.

Non-dischargeability under 11 U.S.C. § 523(a)(6) requires both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both*, an objection to discharge under that section must fail.").  The United States Supreme Court has held that the term "willful" requires proof of a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury.  *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998).

"[T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself."  *Id.* at 61-62.

The Tenth Circuit has held that "the term 'malicious' requires proof 'that the debtor either intend[ed] the resulting injury or intentionally [took] action that [was] substantially certain to cause injury.'" *Moore*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).  The Tenth Circuit Bankruptcy Appellate Panel determined the definition of "malicious" in *Moore* was *dicta* and applied a different standard to determine whether there is a malicious injury. *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R.

901, 918 (B.A.P. 10th Cir. 2020).  The totality of the circumstances must be examined to determine whether the act was performed without justification or excuse.  The act must be wrongful.  *Id*. at 919-20.

## DISCUSSION

The Special Jury Verdict awarded compensatory damages in the total amount of $250,000 based on four theories of recovery.  In applying collateral estoppel, the focus is not on the particular theory of recovery but on whether the prior findings essential to the judgment are the same to prove the elements of the dischargeability claims.

1. Undue Influence.

The jury returned a verdict in favor of Plaintiff that the change of the beneficiary designation to Laura by Cheryl was the product of undue influence and awarded damages in the amount of $247,424.97, the total value of the four CDs.

Under Minnesota law, undue influence is defined as "influence of such a degree exerted upon a person by another that it destroys or overcomes the person's free agency and substitutes the will of the person exercising the influence for that of the other person."

To prove undue influence, clear and convincing evidence must prove not only that the influence was exerted but also that the influence was so dominant and controlling of the influenced parties' mind that, in making the contract, the influences party ceased to act of his or her own free will.

Undue influence has been found to constitute a nondischargeable claim under 11 U.S.C. § 523(a)(6).  *Necaise v. Necaise (In re Necaise)*, 2013 Bankr. LEXIS 3601 (Bankr. S.D. Miss. Aug. 28, 2013).

The jury specifically found that the change of the beneficiary designation for each of the four CDs was the product of undue influence by Laura Craig.  Under Minnesota law, the burden of proof is a clear and convincing standard, a higher standard of proof than the preponderance of evidence for nondischargeability claims under 11 U.S.C. § 523(a).

The jury's findings satisfy the elements of 11 U.S.C. § 523(a)(6).  The exercise of influence by Laura over Cheryl was "willful" in that the actions to persuade Cheryl to change the beneficiary designations was done with the intent to deprive the Plaintiff of the value of the CDs.  The acts were "malicious" in that Laura intended to deprive, or injure, the Plaintiff's entitlement to the value of the CDs and the acts were wrongful and committed without justification or excuse.  The change in beneficiary designation was substantially certain to cause the intended injury.

The compensatory damages awarded for undue influence are excepted from discharge under 11 U.S.C. § 523(a)(6).

2. Financial Exploitation of a Vulnerable Adult.

The jury returned a verdict in favor of the Plaintiff and against the Craigs on the statutory claim of financial exploitation of a vulnerable adult in the amount of $250,000.

20

In Subd. 1 of the Vulnerable Adult Act ("VAA") (Minn. Stat. § 626.557), the Minnesota legislature stated, "The legislature declares that the public policy of this state is to protect adults who, because of physical or mental disability or dependency on institutional services, are particularly vulnerable to maltreatment."

In furtherance of the public policy, Subd. 20 of the VAA created a private cause of action for financial exploitation of a vulnerable adult, and in addition to compensatory damages, provides for treble damages and reasonable attorney fees and costs.

The jury instructions incorporated the definition of "vulnerable adult" as defined in Minn. Stat. § 626.5572, Subd. 21(a)(4)(i) and (ii):

(a) "Vulnerable adult" means any person 18 years of age or older who:

(4) regardless of residence or whether any type of service is received, possesses a physical or mental infirmity or other physical, mental, or emotional dysfunction:

(i)  that impairs the individual's ability to provide adequately for the individual's own care without assistance, including the provision of food, shelter, clothing, health care, or supervision; and

(ii) because of the dysfunction or infirmity and the need for care or services, the individual has an impaired ability to protect the individual's self from maltreatment.

The jury instructions also incorporate the definition of "financial exploitation" as defined in Minn. Stat. § 626.5572, Subd. 9(b)(3)).

(9) "Financial exploitation" means:

(b) In the absence of legal authority a person:

(3) acquires possession or control of, or an interest in, funds or property of a vulnerable adult through the use of undue influence, harassment, duress, deception, or fraud;

The jury returned a special verdict finding that:

1. Cheryl was a vulnerable adult.

2. Laura and/or Stephen acquired possession or control of an interest in personal property or other financial resources of Cheryl through the use of undue influence.

3. Laura and/or Stephen acted in the absence of legal authority.

The jury's findings satisfy the elements to establish the nondischargeability of the debt under 11 U.S.C. § 523(a)(4) for larceny.  In the absence of the Craigs' actions, Plaintiff would have been entitled to the value of the four CDs.

The Craigs acquired the CDs through the use of undue influence and without legal authority by inducing Cheryl to change the beneficiary designation to Laura.  This finding satisfies the element that the property was fraudulently and wrongfully taken.

21

The intent to permanently deprive the Plaintiff of the value of the CDs is inferred from the change in the beneficiary designations to Laura.  The purpose of the change in the beneficiaries was to permanently deprive the Plaintiff of the CDs.

Because Cheryl was a vulnerable adult, susceptible to undue influence and the jury made a specific finding that Laura exercised undue influence over Cheryl to obtain the change in beneficiary designation, Cheryl was unable to willingly consent to the change in the beneficiary designation.

The jury's findings also satisfy the elements of 11 U.S.C. § 523(a)(6) for willful and malicious injury.  The Plaintiff was entitled to the value of the CDs upon Cheryl's death.  The Craigs financially exploited Cheryl with deliberate intent to cause injury to the Plaintiff by depriving the estate of the value of the CDs.  The change in the beneficiary designation through financial exploitation was willful, substantially certain to cause injury to the Plaintiff, and was committed without justification or excuse.

The treble damages and attorney fees and costs provided for under Minn. Stat. § 526.557 Subd. 20 are based on the same underlying conduct that warrants the nondischargeability of the compensatory damages and are likewise nondischargeable.  *See McCain Foods USA, Inc. v. Shore (In re Shore)*, 305 B.R. 559, 570 (Bankr. D. Kan. 2004); *Dorris v. Chacon (In re Chacon)*, 438 B.R. 725, 737 (Bankr. D.N.M. 2010).

The compensatory damages awarded for financial exploitation of a vulnerable adult are excepted from discharge under 11 U.S.C. § 523(a)(4) and (a)(6).

3. Tortious Interference with Prospective Economic Advantage.

Intentional torts can be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

The jury found that the Plaintiff reasonably expected to be the recipient of some economic advantage from a third-party.  Specifically, the expectation to receive the value of the CDs.  The jury found the Craigs were aware of the prospective economic advantage.  The jury found the Craigs intentionally and tortiously interfered with the prospective economic advantage.  And, the jury found in the absence of the Craigs' wrongful conduct, it was reasonably probable that Plaintiff would have realized the economic advantage of benefit.  The jury awarded compensatory damages in the amount of $250,000.

The Craigs actions in intentionally and tortiously interfering with Plaintiff's prospective economic advantage from receipt of the value of the CDs was willful and malicious.  It was willful in that the interference was intended to deprive Plaintiff of the prospective economic advantage and malicious in that it was substantially certain to cause the injury and was wrongful and committed without justification or excuse.

The compensatory damages awarded for tortious interference with prospective economic advantage are excepted from discharge under 11 U.S.C. § 523(a)(6).

4. Unjust Enrichment.

The jury found the Craigs received something of value from Cheryl, the value of the CDs through the change in the beneficiary designations.  The Craigs knowingly accepted the

thing of value and that it would be unjust for the Craigs to retain the thing of value.  The jury awarded compensatory damages in the amount of $247,424.97.

The fourth theory for recovery, unjust enrichment, does not rise to the level of wrongful conduct to except the debt from discharge under either 11 U.S.C. § 523(a)(4) or (a)(6).

## CONCLUSION

Collateral estoppel, or issue preclusion, applies to the rulings and jury the jury verdict in the State Court Case.  There were final judgments entered on the merits, the parties to the State Court Case were the same.  The parties were given a full and fair opportunity to be heard and the issues determined in the State Court Case are dispositive of the dischargeability claims under 11 U.S.C. § 523(a).

For the reasons set forth above, it is ORDERED:

1. That the Motion for Summary Judgment (Doc. 15) filed by Stephen Craig and Laura Craig is hereby GRANTED.  Plaintiff's First Claim for Relief pursuant to 11 U.S.C. § 523(a)(2)(A) is dismissed with prejudice.

2. Plaintiff's Motion for Summary Judgment (Doc. 17) is hereby GRANTED.  The Judgment entered in the State Court Case in the amount of $918,522.81 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) and (a)(6).

Dated this 19th day of May, 2026.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge

23